IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:16-CR-242-2** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **TAJIE RESHANE HODGE** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

Before this court are Defendant Tajie Reshane Hodge's motions (Docs.
28 & 31) to suppress statements made to law enforcement during a traffic stop and
a subsequent search of her home several hours after the stop.  In her first motion,
Defendant argues that her statements to police while executing a search warrant of
her home should be suppressed because she was subject to custodial interrogation
without being informed of her *Miranda*[1] rights; alternatively, she argues that, if she
was advised of her *Miranda* rights, she did not waive those rights knowingly,
voluntarily, or intelligently.  (Doc. 29 at 3-4).  In that motion, Defendant also seeks
suppression of the fruits of law enforcement's search of her cell phone and vehicle,
arguing that she did not voluntarily consent to those searches.  (Doc. 29 at 9).  In
her second motion, Defendant argues that her statements during a preceding traffic
stop should be suppressed because police impermissibly extended the stop.  (Doc.
32 at 3).  After careful consideration of these arguments, the court will deny
Defendant's motions in their entirety.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

## I.        **Background**

On August 24, 2016, Defendant and her husband, Carl Theodore Hodge, were indicted on one count of conspiracy to distribute 28 grams or more of cocaine base, 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii), 846 (Count 1), and four counts of distribution of cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii) (Counts 2-5). (Doc. 1 at 2-5).  The charges stem from controlled drug transactions occurring between Defendant's husband and a confidential informant from July 25, 2016, to July 27, 2016.  (*Id.*)  Defendant pleaded not guilty to the charges against her on October 4, 2016.  (Doc. 15).

On November 18, 2016, Defendant filed a motion to suppress statements made to law enforcement during the execution of a search warrant of her home. (Doc. 28).  On November 30, 2016, Defendant filed a supplemental motion to suppress videotaped statements from a traffic stop preceding the home search. (Doc. 31).  On May 17, 2017,[2] a suppression hearing was held on the motions. (Doc. 53).  At the conclusion of the hearing, the court requested the Government file a response to Defendant's motions.  On June 6, 2017, the Government filed its opposition brief, arguing that Defendant was advised of her *Miranda* rights and voluntarily waived those rights prior to making statements to law enforcement. (Doc. 61 at 6-7).  On June 20, 2017, Defendant filed her reply.  (Doc. 73).

---

[2] On May 15, 2017, this case was reassigned to the undersigned.

## II.      Findings of Fact

At the suppression hearing, the court heard testimony from three law enforcement officers who were part of a York County Drug Task Force ("Drug Task Force") that was investigating Defendant's husband for drug transactions: Detectives Scott Nadzom and Andrew Shaffer of the York City Police Department ("YCPD"), and Special Agent Ryan Anderson of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  The court gleans the following facts from their testimony, the evidence introduced at the hearing, and Defendant's own motions.[3]

After receiving information from a confidential informant about suspected drug transactions, the Drug Task Force, under Detective Nadzom's direction, began investigating and surveilling Defendant's husband.  The Drug Task Force conducted controlled drug transactions between the informant and Defendant's husband on July 25 and 26, 2016.  When those transactions took place, Detective Nadzom and other YCPD officers also observed Defendant, who was operating a Nissan Altima.  Based on these transactions, at 10:55 a.m. on July 27, 2016, Detective Nadzom obtained a search warrant for Defendant's and her husband's home.  At 1:00 p.m. and 3:30 p.m. that day, Detective Nadzom conducted two more controlled drug transactions with Defendant's husband.

---

[3] Although we do so without a transcript from the hearing, the parties' briefing and the court's notes adequately describe the events testified to by law enforcement.  The following account represents the facts the court credits upon consideration of the testimony and evidence.

The next morning, at approximately 3:27 a.m., YCPD Officer Vincent Monte, who was not part of the Drug Task Force investigating Defendant's husband, observed Defendant driving her Nissan Altima with an inoperable license-plate lamp. Officer Monte performed a traffic stop of the vehicle. Although the initial stop was not recorded by his motor vehicle recording device (MVR), which was non-operational at the time, Officer Monte's subsequent interactions once he approached Defendant's vehicle were videotaped by his body camera. The videotape, which was introduced into evidence at the suppression hearing, reveals the following.

Defendant provided Officer Monte with her vehicle's insurance information, but stated that she left her identification in her husband's vehicle. Defendant recalled her driver's license number from memory and provided Officer Monte with her name, license number, and current address. Officer Monte then explained that he stopped Defendant because "the license plate lights on the vehicle are out,"[4] and asked Defendant where she was coming from and going to. Defendant initially said she was coming from her home and headed to a friend's house, but immediately after this statement, Defendant revealed that she was

_____

[4] The recording does not reveal whether Defendant's license-plate lights were illuminated. In her briefing, Defendant indicates that she found her license-plate lamps "were working" when she arrived at her destination. (Doc. 31 at 4). These allegations, however, are not substantiated by the record, as the court heard no testimony to contradict Officer Monte's credible videotaped statement that he stopped Defendant for an unilluminated license-plate lamp.

"actually . . . looking for [her] husband, to be honest," and said that her husband was "doing something he ain't supposed to be doing."

Officer Monte did not inquire further, but returned to his vehicle for six minutes, during which time he inputted Defendant's information in his computer, learned that Defendant's license was suspended, and wrote a traffic citation. Officer Monte returned to Defendant's vehicle, handed back her insurance card, and asked if she was aware that her license was suspended. Defendant responded that she was unaware, at which point she answered an incoming cell phone call. When Defendant's brief phone conversation ended, she explained to Officer Monte that she had traffic tickets, but thought that her license was not suspended because she had paid a fine. Officer Monte issued Defendant a citation for driving with a suspended license, but explained that, if she resolved the issue with Pennsylvania's Department of Transportation, he would request the citation be dismissed.

Officer Monte then asked whether Defendant was able to get in contact with her husband; she responded that she was not. Apparently familiar with Defendant's husband, Officer Monte inquired if her husband's name was Carl, to which Defendant responded affirmatively. Officer Monte said that he had not seen her husband that night. Unprompted by any further questioning from Officer Monte, Defendant then asked, "Can I tell you something?" Officer Monte

indicated that she could, and Defendant proceeded to give Officer Monte detailed information regarding her husband's involvement in drug transactions.

Defendant told Officer Monte that her husband was selling "a lot of drugs," specified an amount of approximately 100 grams, and indicated that she was trying to report it to Detective Nadzom. Defendant also provided Officer Monte with her husband's three cell phone numbers and the contact information of persons with whom her husband was buying and selling. Officer Monte asked if Defendant's husband kept the drugs on him, to which she responded affirmatively. Defendant detailed that her husband primarily sold crack and disclosed that he bought a .40 caliber firearm, which he kept at a friend's home. Defendant also indicated where, and who, "cooks up" the drugs for her husband, as well as what kind of vehicle her husband drives. Officer Monte said that he appreciated Defendant's willingness to give him the information about her husband, and, based on the information, said that he would "see what [he] could do" regarding the suspended license citation. It is unclear when the traffic stop precisely terminated, as the body camera video footage ended shortly after these statements. The total videotape lasted approximately twenty minutes.

About two hours after the stop, at 5:42 a.m., Officer Monte emailed Detective Nadzom about the information Defendant had provided. At the time of the email, Detective Nadzom was staking out Defendant's residence in preparation

for executing the previously obtained search warrant. At 6:05 a.m., Detective Nadzom and a "conglomerate" of approximately eight other officers from the Drug Task Force, including Special Agent Anderson and Detective Andrew Shaffer, executed the search warrant at Defendant's—and her husband's—residence.

The officers knocked and announced their presence, and, with firearms unholstered, entered the home and performed a protective sweep of the premises. The officers brought the home's occupants, consisting of Defendant, who was in the second floor hallway, as well as her five-year-old daughter and a nineteen-year-old female friend, who were sleeping on a couch in the first floor's front room, to the home's living room. Defendant was handcuffed[5] and read the search warrant, which identified her husband as the owner of the premises. Detective Nadzom advised Defendant of her *Miranda* rights and asked Defendant if she understood her rights. Defendant verbally acknowledged that she understood her rights.

While officers searched the home, Defendant requested to speak with Detective Nadzom. Defendant was brought to the kitchen in the rear of the home and initially spoke only with Detective Nadzom, but, at times, Special Agent Anderson and Detective Shaffer joined the conversation. During the conversation, which lasted approximately thirty minutes and during which time the officers' firearms were holstered, Defendant made incriminating statements. No threat or

---

[5] Although it is unclear when, Defendant's handcuffs were removed at some point during or after law enforcement's execution of the search warrant.

use of force was utilized.  Special Agent Anderson and Detective Shaffer both

testified that Defendant was cordial, candid, and cooperative, was able to maintain

"intelligent conversations," did not appear intoxicated, and did not smell of alcohol

during the conversation.  Likewise, Detective Nadzom also testified that Defendant

did not appear impaired, although he did smell alcohol.

At some point after the conversation, Defendant consented to a search of

her vehicle on the premises and agreed to accompany officers to the police station

that morning to have data extracted from her cell phone.  When Defendant arrived

at the station, she was not re-read her *Miranda* rights or placed under arrest.  At

approximately 10:36 a.m., Defendant initialed and signed a consent form advising

her that she was a suspect in a drug investigation, and stating that she voluntarily

agreed to permit the search of her cell phone.  The consent form was introduced

into evidence at the suppression hearing.  Defendant also made incriminating

statements at the station.  She eventually left the station because the data extraction

was taking a long time, and her phone was left in YCPD custody.  Defendant did

not invoke her *Miranda* rights during any of her interactions with law enforcement.

## III. <u>Discussion</u>

In her motions to suppress, Defendant challenges law enforcement's

actions during the traffic stop and the execution of the search warrant at her home.

As to the traffic stop, Defendant argues that her statements should be suppressed as

fruit of the poisonous tree because Officer Monte "impermissibly extended the duration of the traffic stop to ask questions unrelated to the stop."[6] (Doc. 32 at 3). As to the execution of the search warrant, Defendant argues that she was subject to custodial interrogation without being advised of her *Miranda* rights; that if she was advised of her *Miranda* rights, she did not knowingly, voluntarily, or intelligently waive those rights; and that she did not voluntarily consent to a search of her cell phone or vehicle. (Doc. 29 at 6-9). The court rejects all of these arguments.

## A.    Statements from the Traffic Stop

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a "seizure" under the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). The government bears the burden of showing, by a preponderance of the evidence, that each individual act constituting a search or seizure under the Fourth Amendment was reasonable. *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

---

[6] In its opposition brief, the Government contends that Officer Monte did not need to advise Defendant of her *Miranda* rights because a routine traffic stop does not amount to custodial interrogation. (Doc. 61 at 7 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984))). The court notes that this contention is unresponsive to Defendant's suppression argument that Officer Monte impermissibly "prolonged the stop to ask the identity of her husband[,] who was the target of an investigation by his police department." (Doc. 32 at 4).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Bonner,* 363 F.3d 213, 216 (3d Cir. 2004) ("A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation."). "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Seizure of the driver "ordinarily continues, and remains reasonable, for the duration of the stop." *Id.* The seizure is "justified solely by the interest in issuing a . . . ticket to the driver," and "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). On the other hand, "'[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.'" *United States v. Wilson*, 413 F.3d 382, 386-87 (3d Cir. 2005) (quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).

"[O]nce a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). The "tolerable duration of police inquiries in the traffic-stop

context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Caballes*, 543 U.S. at 407). "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 1615.

Here, after observing Defendant operating a vehicle with unilluminated license-plate lamps, Officer Monte executed a permissible traffic stop for an apparent violation of 75 Pa. Cons Stat. § 4303(b). Officer Monte requested Defendant's credentials, explained his rationale for the stop, and briefly asked where Defendant was coming from and going to. Defendant first stated that she was headed to a friend's home, but then revealed that she was "actually . . . looking for [her] husband, to be honest," who she admitted was "doing something he ain't supposed to be doing." Officer Monte did not ask any further questions, but returned to his vehicle to verify her credentials. After learning that Defendant's license was suspended and writing a traffic citation, Officer Monte returned to Defendant's vehicle, made her aware of the suspended license, and handed her a citation, explaining that she could plead guilty or not guilty and that the instructions for answering the citation were on the back of the ticket.

Prompted by Defendant's earlier statements, Officer Monte asked whether Defendant was able to get in touch with her husband and inquired whether her husband's name was Carl. Although Defendant is correct that "[h]er husband's identity did not pertain to the reason for the traffic [stop]," (Doc. 32 at 4), it is well established that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. Given the aforementioned context, it was reasonable for Officer Monte to ask brief questions about Defendant's husband. Officer Monte was not part of the Drug Task Force investigating Defendant's husband and did not ask questions related to drug activities. Officer Monte also did not *measurably* extend the stop with his questions, but followed up on Defendant's earlier statements that she was out looking for her husband.

Officer Monte also did not impermissibly extend the duration of the traffic stop when, after Defendant stated that she was unable to get in touch with her husband, Defendant initiated further conversation by asking, "Can I tell you something?" With no interruption by Officer Monte, Defendant proceeded to implicate her husband in drug transactions and, without being asked, volunteered to provide Officer Monte with her husband's cell phone numbers so police could "track his phones," even adding that she was "trying to get ahold of Detective

12

Nadzom," who was leading the Drug Task Force investigating her husband. Officer Monte took out a notepad and pen to take notes on the ensuing conversation, which was largely dominated by Defendant. Officer Monte interjected only to ask follow-up questions.

Because Defendant had already been issued a traffic citation and then proceeded to initiate further conversation with Officer Monte about her husband's drug-related activities, the court finds that, under the circumstances, the traffic stop became a consensual encounter. Defendant, not Officer Monte, extended the duration of the stop to voluntarily disclose information regarding her husband's drug activities. Officer Monte had already handed Defendant a traffic citation and did not elicit a conversation about drugs, but only asked whether Defendant could get in touch with her husband. The subsequent conversation, spurred by Defendant asking Officer Monte if she could "tell [him] something," was a consensual encounter. Defendant was free to leave, but instead prolonged the encounter to divulge information about her husband's drug-related activities. At the time Defendant volunteered the information, the traffic stop had only lasted approximately ten minutes. *See, e.g.*, *United States v. Meikle*, 407 F.3d 670, 673 (4th Cir. 2005) (finding eleven-minute traffic stop became consensual encounter where officer returned defendant's license and registration, shook his hand, and, as

defendant walked back to his vehicle, officer asked if he could speak further to defendant, to which defendant consented).

Moreover, even if the ensuing conversation between Defendant and Officer Monte did not deescalate to a consensual encounter, any extension of the traffic stop for Officer Monte to inquire about Defendant's husband's drug-related activities was appropriate under the circumstances. "Once a valid traffic stop is initiated, 'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)). Defendant need not have disclosed her husband's drug activities to Officer Monte. Once she did, however, Officer Monte was under no obligation to terminate the traffic stop or the ensuing conversation. Rather, when Defendant revealed that her husband was "selling drugs again," Officer Monte clearly had reasonable suspicion of criminal activity such that he could permissibly make further inquiry of her husband's activities. Moreover, the entire traffic stop, including the discussion of Defendant's husband's drug activities, was not unreasonably long, spanning approximately twenty minutes. Accordingly, the court will deny Defendant's motion to suppress inculpatory statements made during the traffic stop.

**B.**     <u>Statements During Execution of the Search Warrant &
Consensual Searches of Cell Phone and Vehicle</u>

The Fifth Amendment of the United States Constitution states that "[n]o

person . . . shall be compelled in any criminal case to be a witness against himself."

U.S. Const. amend. V.  In *Miranda v. Arizona*, the United States Supreme Court

provided a mechanism to safeguard the Fifth Amendment's privilege against self-

incrimination.  384 U.S. 436, 467 (1966) ("In order . . . to permit a full opportunity

to exercise the privilege against self-incrimination, the accused must be adequately

and effectively apprised of his rights and the exercise of those rights must be fully

honored.").  As such, before a custodial interrogation, a suspect must be fully

informed of the Government's "intention to use [her] statements to secure a

conviction," *Moran v. Burbine*, 475 U.S. 412, 420 (1986), and of her rights to

remain silent and to have counsel present, *Miranda*, 384 U.S. at 469.

Law-enforcement officers "are not required to administer *Miranda*

warnings to everyone whom they question."  *Oregon v. Mathiason*, 429 U.S. 492,

495 (1977).  *Miranda* warnings are needed when a suspect is "(1) 'in custody' and

(2) subject to 'interrogation' by the government."  *United States v. Dupree*, 617

F.3d 724, 731 n. 7 (3d Cir. 2010).  A suspect is "in custody" when "there is a

'formal arrest or restraint on freedom of movement' of the degree associated with a

formal arrest."  *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting

*California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  When a suspect is not under

arrest, the inquiry is whether a reasonable person in the suspect's situation would feel free to end the questioning and leave.  *See Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004); *see also United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005).  To answer this question, courts consider: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.  *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

Additionally, where an individual is under custodial interrogation and advised of her *Miranda* rights, she may waive those rights verbally or in writing, so long there is "a deliberate choice to relinquish the protection those rights afford."  *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010)).  A waiver of *Miranda* rights must be knowing, voluntary, and intelligent.  *See Moran*, 457 U.S. at 421; *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005).

In determining whether a waiver is knowing, voluntary, and intelligent, courts undertake a two-pronged inquiry.  First, courts consider whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *United States v. Velasquez*, 885

F.2d 1076, 1084 (3d Cir. 1989) (quoting *Moran*, 475 U.S. at 421 (citation omitted)).  Second, courts determine whether the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  Factors relevant to this totality of the circumstances inquiry include: whether the police engaged in coercive activity; the length, location, and continuity of the interrogation; the age, education, physical and mental condition of the defendant; and whether *Miranda* rights were given.  *See Withrow v. Williams*, 507 U.S. 680, 693 (1993).  The burden is on the Government to prove a waiver of rights by a preponderance of the evidence.  *Velasquez*, 885 F.2d at 1087 (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

Here, the court finds that Defendant was under custodial interrogation when a "conglomerate" of approximately eight police officers entered her home with guns drawn to execute a search warrant, placed her in handcuffs, and asked her questions regarding suspected drug transactions.  *See, e.g.*, *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding in-home interrogation custodial where search was conducted at 6:25 a.m. by eight officers and where

officers exercised physical control over defendant).  However, this court rejects

Defendant's contention that she was not advised of her *Miranda* rights.  The

unrefuted testimony at the suppression hearing by Detectives Nadzom and Shaffer

and Special Agent Anderson, was that, upon entering the home, performing a

protective sweep, and bringing its occupants to a central location, Defendant was

read the search warrant and verbally informed of each of her *Miranda* rights.  All

three officers testified that Defendant verbally acknowledged that she understood

her *Miranda* rights.  As such, Defendant's contention that she does not recall being

informed of her *Miranda* rights, (Doc. 28 at 3), is unsupported by any testimony or

evidence at the hearing.

   As Defendant was advised of her *Miranda* rights, the court addresses her

argument that she "was motivated to speak by the coercive atmosphere created

when no less than eight police officers barged into her home in the early morning."

(Doc. 28 at 5).  Defendant argues that she was "intimidated, worried for her

daughter and affected by alcohol," and that she therefore did not knowingly,

voluntarily, or intelligently waive her *Miranda* rights.  (Doc. 29 at 8-9).  The

unrefuted testimony of law enforcement belies these assertions.

   While officers executed the search warrant, and consistent with her

earlier admission during the traffic stop that she was trying reach out to Detective

Nadzom, Defendant requested to speak with Detective Nadzom away from her

five-year-old daughter and nineteen-year-old female friend. Defendant was brought to the kitchen, where she primarily spoke with only one officer—Detective Nadzom—although two other officers, Detective Shaffer and Special Agent Anderson, at times joined the conversation. From the accounts of each of these officers at the suppression hearing, the ensuing thirty-minute conversation was consensual and Defendant spoke freely and openly, although it is unclear whether she remained handcuffed. The court finds that Defendant's will was not overborne by the three officers, who had their firearms holstered, did not make or imply any threats to her or her daughter, and did not apply any force or intimidation.

Moreover, testimony by Detectives Nadzom and Shaffer, as well as Special Agent Anderson, confirmed that Defendant did not appear impaired or intoxicated. Defendant also did not appear intoxicated from the videotape of the traffic stop just two hours before police executed the search warrant. The unrefuted testimony of law enforcement was that, while Defendant conversed with the officers during the search warrant, she appeared cordial, candid, cooperative, and able to maintain "intelligent conversations." To the extent that there was conflicting testimony regarding the smell of alcohol, that fact does not establish that Defendant was intoxicated and, taken alone, would not negate her ability to voluntarily waive her *Miranda* rights. *See United States v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016) ("Intoxication does 'not automatically render a confession

19

involuntary; rather, the test is whether th[is] mental impairment[ ] caused the defendant's will to be overborne.'" (alterations in original) (quoting *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990))); *see also Ledesma v. Gov't of V.I.*, 159 F. Supp. 2d 863, 867 (D.VI. 2001) ("While courts have recognized the influence of drugs as one factor in determining voluntariness, involuntariness may not be inferred merely because of drug usage or ingestion. Rather, such usage must have had the effect of overcoming [the defendant's] free will.").

In this case, no evidence was presented that Defendant was coerced into making incriminating statements. *See United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) ("A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. . . . A necessary predicate to a finding of involuntariness is coercive police activity."). Defendant had been advised of her *Miranda* rights, she never indicated that she wished to invoke her rights, and there was no testimony showing that she was so intoxicated that she could not knowingly, voluntarily, and intelligently waive her *Miranda* rights. Rather, consistent with testimony at the suppression hearing, Defendant was cooperative and agreed to accompany police to the station, where she again voluntarily made incriminating statements. Based on these circumstances, the court finds that Defendant was forthcoming with

inculpatory information, and knowingly, voluntarily, and intelligently waived her *Miranda* rights in each of her discussions with police.[7]

Finally, the court addresses Defendant's brief argument that she did not voluntarily consent to the search of her vehicle and cell phone during and after the execution of the search warrant.  (Doc. 29 at 9).  Consensual searches are a well-established exception to the Fourth Amendment's warrant and probable cause requirements "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."  *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").  Under this exception, "[c]onsent must be voluntary, may be express or implied, and need not be knowing or intelligent."  *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005).

As with the waiver of *Miranda* rights, when making a determination about the voluntariness of a defendant's consent to search, courts must determine whether consent was "the product of an essentially free and unconstrained choice by its maker," and not the product of duress or coercion, express or implied.

---

[7] To the extent it is argued by Defendant, the court finds that Defendant's prior *Miranda* warnings were not stale and there was no need to be re-*Mirandized* when she agreed to accompany police to the station several hours later.  *See Pruden*, 398 F.3d at 247 (noting factors that courts consider in determining staleness of *Miranda* warnings).

*Schneckloth*, 412 U.S. at 225, 227.  In making this determination, courts consider "the totality of the circumstances," including: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment."  *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009).  Although "knowledge of the right to refuse consent is one factor to be taken into account, the [G]overnment need not establish such knowledge as the *sine qua non* of an effective consent."  *Id.* (quoting *Schneckloth*, 412 U.S. at 227). The burden is on the Government to prove by a preponderance of the evidence that a search was made pursuant to voluntary consent.  *Velasquez*, 885 F.2d at 1081.

Here, no evidence was presented at the suppression hearing that remotely suggests that Defendant's consent to search her cell phone or vehicle were involuntary or coerced.  In fact, as to the search of her cell phone, Defendant initialed and signed a consent-to-search form advising her of her constitutional right to refuse such a search.  In the form, Defendant acknowledged that she "voluntarily and without threats" gave permission for law enforcement to search her phone.  *See United States v. Hynson*, 451 F. App'x 91, 95 (3d Cir. 2011).  As with her waiver of *Miranda* rights, all testimony and evidence at the suppression hearing indicated that Defendant voluntarily consented to the search her vehicle and cell phone, and therefore the court will deny her motion to suppress.

**IV.**      **Conclusion**

After careful consideration of all the circumstances presented herein, the court finds that the Government has proven by a preponderance of the evidence that police did not impermissibly extend the duration of Defendant's traffic stop, that she was fully advised of, and knowingly, voluntarily, and intelligently waived, her *Miranda* rights in her conversations with police, and that she voluntarily consented for the law enforcement officials to search her cell phone and vehicle. Accordingly, the court will deny Defendant's motions to suppress in their entirety.

An appropriate order will issue.


　s/Sylvia H. Rambo
　SYLVIA H. RAMBO
　United States District Judge

Dated: June 21, 2017